**P.T. BANK CENTRAL ASIA, Plaintiff,**

v.

**Fan WONG, Kit Hing Wong, Ching Fun Li, and Jack Lee, Defendants.**

Civ. A. No. CV–93–1630(DGT).

United States District Court, E.D. New York.

Oct. 13, 1995.

**574**

Todd L. Platek, Kirlin, Campbell & Keating, New York City, for plaintiff.

Ronald J. Chisena, Del Rosso & Chisena, Garden City, for defendant Jack Lee.

Daniel J. Gotlin, Gotlin & Jaffe, New York City, for defendant Ching Fun Li.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

The plaintiff, P.T. Central Bank Asia, ("Bank"), moves for summary judgment against the defendants Ching Fun Li and Jack Lee, to enforce their liability as guarantors for the debts of LCL Trading Corp. ("LCL") to the Bank.[1] Ching Fun Li has cross-moved for summary judgment and for sanctions. For the reasons set forth below, the court grants plaintiff's motion for summary judgment against both defendants and denies Li's cross-motion. Plaintiff's motion for attorneys' fees and costs is also granted.

## Background

Defendants guaranteed the debt of LCL, a wholesale seafood company that is now bankrupt. (LCL's trade creditors filed a Ch. 7 petition in April 1992.) Kuwera Aff. dated December 22, 1993, ("Aff. II") Ex. 1–H. LCL had a revolving trade credit line at the Bank from 1986 through 1992. Kuwera Aff. II ¶ 3, September 7, 1995 ("Aff. III") ¶ 6. Under this credit line, in a manner usual for such trade credit lines, LCL was permitted by the Bank to defer payments on unpaid principal, and thus rolled over loans when due with new loans, by paying the interest that was due.[2] Kuwera Dep. pp. 149–50. Kuwera Aff. II ¶ 3.

The credit line, originally $200,000, was increased at several points, rising to $600,000 on June 22, 1988, and then to $700,000 on February 28, 1989. Kuwera Aff. II Ex. 1–F. The amount outstanding under the credit line rose to a maximum of $650,000 in May 1990 and remained at that level until it was paid down to $168,967 in 1992, immediately prior to the bankruptcy. Kuwera Aff. III ¶ 7, Ex. 6. (Subsequent to the bankruptcy the Bank collected $51,079 through foreclosure of its secured interests. Kuwera Aff. II ¶ 8.)

On July 26, 1990, LCL executed a promissory note for $700,000 in favor of the Bank. Kuwera Aff. II ¶ 11, Ex. 1–C. On that same date, Ching Fun Li executed a continuing guarantee to secure all of LCL's liabilities to the Bank. Kuwera Aff. II ¶ 14, Ex. 1–F.

---

1. The two other defendants, Fan Wong and Kit Hing Wong, have never appeared in this case. A default judgment was issued against Kit Hing Wong on November 16, 1994. No proof of service against Fan Wong has been filed.

2. Paul Kuwera, Vice President of P.T. Bank Central Asia and the account officer with responsibility for the LCL account in 1991–92, was deposed by the defendants on October 21, 1993. Defendants have been very selective in their use of Mr. Kuwera's deposition in their attempt to establish that the January advances were new credit. It should be noted that Mr. Kuwera is a not a lawyer and his use of "new loan" was not synonymous with "new credit." In context, it is evident that what Mr. Kuwera called "new loans" referred to the refunding of existing credit.

Q.: Did LCL have a revolving trade credit line?
A.: Yes.

Q.: What is the meaning of that?
A.: It means when a loan is due, depends on the type of the revolving line, the customer may submit new bills and pay the interest of the old loans and book a new one.
Q.: When that happens, is new principal issued or is the interest just paid down and the debt goes on?
A.: When they book the new loan, the new loan will pay off the old loan, and the new loan will become effective and they just pay the interest.
(Kuwera Dep. Tr. at 149.)

In addition to their neglect of this portion of Mr. Kuwera's testimony that makes clear the relation of "new loans" to the credit line, the defendants have never addressed the evidence provided by the Bank's Line of Credit Control Ledger, Kuwera Aff. II, Ex. 6.

The Bank has also provided a copy of a similar continuing guarantee dated July 26, 1990, signed by Jack Lee. Kuwera Aff. II ¶ 15 Ex. 1–G.

■ Ching Fun Li and Jack Lee had previously guaranteed LCL's credit line with the Bank. Ching Fun Li executed guarantees on May 15, 1986 and March 15, 1989. Kuwera Aff. II ¶ 12, Ex. 4 & 5. Jack Lee executed guarantees on October 21, 1987 and March 25, 1989. Kuwera Aff. II ¶ 16, Ex. 9 & 10. However, although Lee admits the validity of his signature on the continuing guarantee dated July 26, 1990, he denies signing the document on that date.[3] Lee Aff. ¶ 6. Instead, Lee claims that he signed an undated continuing guarantee in December 1990, at the request of Fan Wong, the president of LCL. Fan Wong allegedly assured Lee that this guarantee, printed on Bank Central Asia letterhead, "had nothing to do with the $700,-000.00 line of credit," and concerned only "other" credit lines extended by the Bank to LCL. Lee alleges that he had numerous conversations with Paul Kuwera with regard to his refusal to sign a guarantee for a $700,-000 line of credit in May–July 1990. Lee Aff. ¶ 4. Kuwera denies recollection of such conversations and offers documentary evidence demonstrating that the line of credit had already been extended to $700,000 in March 1989. Kuwera Aff. III ¶ 13. Another guarantor of the loan, Yoi Kin Li, provided Lee with an affidavit concerning his participation, at the direction of LCL president Fan Wong, in obtaining Lee's signature in blank on a guarantee form in December 1990.[4] Yoi Kin Li Aff. ¶ 4 & 5.

In accordance with its previous practice regarding the revolving trade credit line, the Bank periodically extended the due date for the July 26, 1990 promissory note. Kuwera Aff. II ¶ 4. These rollovers were registered on the Bank's Line of Credit Control Ledger. Kuwera Aff. II, Ex. 6.

By letter dated November 25, 1991, Ching Fun Li terminated her continuing guarantee. Li Aff. Ex. E. At that time, the unpaid balance on the line of credit was $650,000. Kuwera Aff. II, Ex. 6. In January 1992, the Bank issued new rollovers to cover this liability, as it had done previously. LCL, during this period, reduced the outstanding balance in 1992 from $600,000 at the end of 1991 to $168,967 in April 1992. Kuwera Aff. III Ex. 6. Ultimately, however, in the end, LCL lacked the financial resources to pay off its remaining debt.

On April 1, 1992, three of LCL's main trade creditors filed an involuntary petition under Chapter 7 of the Bankruptcy Code against LCL. The automatic stay was vacated to permit the Bank to foreclose on its security interests in certain of LCL's assets. Kuwera Aff. II ¶ 8. However, with accumulated interest, LCL still owed the Bank over $100,000 on the line of credit after this foreclosure. Kuwera Aff. August 12, 1993 ("Aff. I") ¶ 19. The Bank then attempted to collect on LCL's debts from its guarantors, the defendants. Kuwera Aff. I ¶ 9, Ex. 1–J. When it was unsuccessful it commenced this suit in April 1993 to enforce its continuing guarantees against the defendants.

### Discussion

#### (1)

#### Ching Fun Li

Ching Fun Li's defense to enforcement of her guarantees of LCL's indebtedness is premised on her letter to the Bank dated

---

**3.** Jack Lee's attorney, Ronald J. Chisena, Esq., did not file opposition papers to the Bank's motion for summary judgment. In addition, Mr. Chisena did not appear at oral argument held on September 29, 1994. Thereafter, the Bank moved for a default judgment against Jack Lee. Mr. Chisena then filed papers in opposition to the default judgment, and included therein his affirmation, and the affidavits of Jack Lee and Yoi Kin Li, which he claimed he had intended to file to oppose the Bank's motion for summary judgment. Although the explanation which Mr. Chisena provides does not show that he is free from fault for his failure to timely file his opposition papers to the Bank's summary judgment motion, the court, nevertheless, denies the Bank's motion for a default judgment. Thus, the court has reviewed the opposition papers submitted by Mr. Chisena in accordance with Fed. R.Civ.P. 56.

**4.** Yoi Kin Li is the former vice president of LCL and the ex-husband of defendant Li. He has not been sued in this action because he filed for Chapter 7 protection in 1993.

November 25, 1991 in which Li attempted to terminate her guarantees for LCL indebtedness. Li Cross–Motion Attachment G. On July 26, 1990, Ching Fun Li executed a continuing guarantee to secure all of LCL's liabilities to the Bank. She had previously executed similar continuing guarantees in May 1986 and March 1989.

Ching Fun Li is the ex-wife of the former vice-president and manager of LCL, Yoi Kin Li. Li did not contest the assertion in the bank's affidavit that Li executed the last guarantee during her divorce proceeding and only cancelled it one year after the divorce judgment. Platek Aff. ¶ 17. Li's cancellation preceded by only four months the LCL trade creditors' filing of Ch. 7 bankruptcy proceedings and may have resulted from inside knowledge of LCL's declining fortunes.[5] Li's ex-husband, Yoi Kin Li, filed for bankruptcy protection on February 5, 1993 and thus, although also a guarantor on the loans, is not a defendant in this suit.[6] Plaintiff's Mem. 8/18/93 at 3.

Ching Fun Li claimed that she should not be held liable for LCL's debts to the Bank because the liability at issue arose from January 1992 loans, which were issued approximately two months after she terminated her continuing guarantee. This argument is simply erroneous, factually and legally.

■ The factual argument, which has contributed greatly to delay this case, was given surface plausibility because the complaint identified the loans sued upon as made in January 1992 based upon of the Bank's practice of denominating rollover funding as "Loans," each with a new identifying number and issue date. Although defendants had deposed the Bank's loan officer, Paul Kuwera, on October 21, 1993, because of remaining ambiguities in the record the court felt it appropriate to grant the attorney for Mrs. Li the opportunity to conduct additional discovery with respect to the documentation of the loan transactions.[7] As a result, defendant Li was permitted to conduct extensive additional discovery of the Bank to obtain documentation to support her claim that the loans sued upon represented new advances of credit rather than a refunding of existing trade credit.

The extensive examination of the Bank's records of the line of credit and the related loan transactions has produced no evidence that the monies due represent anything other than a refunding of a line of trade credit. Despite the fact that renewed discovery has removed any doubts on the issue, defendants continue to press the claim that the January 1992 loans were new advances of credit.

The standard for deciding motions for summary judgment is specified in the Federal Rules of Civil Procedure:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). As the Supreme Court noted in *Celotex Corp. v. Catrett:* "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson* at 248, 106 S.Ct. at 2510. On the issue of the nature of the January 1992 loans, the documentary evidence is unequivocal that

---

5. Li's continuing connection to LCL may perhaps be inferred from her entitlement to $2,500 per month in child support and alimony pursuant to the judgment of divorce from her ex-husband, LCL's vice president and manager. Li Cross–Motion Attachment G.

6. Defendant Lee presents an affidavit from Yoi Kin Li in his Affirm. in Opp'n., Exhibit F.

7. As noted above, Jack Lee's attorney, Ronald J. Chisena, Esq., who did participate in the Kuwera deposition, did not file opposition papers to the Bank's motion for summary judgment nor appear at the oral argument held on September 29, 1994. *See* n. 3.

the "loans" were merely refunding of trade credit.

■ Moreover, even if there was some factual basis for defendants' argument, as a matter of law the defense is insufficient. In *Corn Exchange Bank Trust Co. v. Gifford,* 268 N.Y. 153, 197 N.E. 178 (1935), the argument that the guarantor was not liable when the lender advanced "new" credit following the guarantor's termination of his guarantee was proffered to, and rejected by, the New York Court of Appeals. *Accord, Chemical Bank v. Sepler,* 60 N.Y.2d 289, 469 N.Y.S.2d 609, 457 N.E.2d 714 (1983). In *Corn Exchange,* the defendant Gifford had executed a guarantee that covered renewals or extensions of credit in support of the borrower's promissory note. Gifford claimed he was freed from liability because the Bank extended credit to the borrower after he terminated his guaranty. The court disagreed.

> To the extent of $100,000, says Mr. Gifford, I guarantee the payment of every claim 'now existing or which may hereafter arise.' If the note guaranteed became due and was renewed, it would be a claim either existing or arising after the guaranty. The agreement then goes on to state that the guaranty 'shall remain in force until duly revoked by me by notice in writing to the said company and shall extend to and cover all renewals of any claims or demands guaranteed under this instrument.' *These words are broad enough to cover the renewals of an indebtedness existing at the time of revocation.*

*Id.* at 158–59, 197 N.E. at 180 (emphasis added).

The continuing guarantee which Ching Fun Li signed stated:

> The undersigned hereby consents and agrees that from time to time, before or after any default by the Borrower or any notice of termination hereof, with or without further notice to or assent from the undersigned, any security at any time held by or available to the Bank for any obligation of the Borrower, or any security at any time held by or available to the Bank for any obligation of any other person secondarily or otherwise liable for any of the liabilities of the Borrower, may be ex-

> changed, surrendered or released and any obligation of the Borrower, or of any such other person, may be changed, altered, *renewed, extended, continued,* surrendered, compromised, waived or released in whole or in part, or any default with respect thereto waived, and the Bank may fail to set off and may release, in whole or in part, any balance of any deposit account or credit on its books in favor of the Borrower, or of any such other person, and *may extend further credit in any manner whatsoever to the Borrower,* and generally deal with the Borrower or any such security or other person as the Bank may see fit; *and the undersigned shall remain bound under this guaranty notwithstanding* any such exchange, surrender, release, change, alteration, *renewal, extension, continuance,* compromise, *waiver,* inaction, extension of further credit or other dealing.

> . . . .

> The undersigned hereby waives *(a) notice of acceptance of this guaranty and of extensions of credit by the Bank to the Borrower. . . .* (Emphasis added.)

Under this language, Ching Fun Li is liable for the outstanding balance on LCL's unpaid credit line with the Bank. At the time she terminated her guarantee, the balance outstanding on the line of credit was $650,000. Kuwera Aff. II ¶ 4.

Clearly, Li's November notice of revocation protected her from the Bank's increasing the outstanding balance to the maximum of $700,000 which she had agreed to in the July 1990 note, but the guarantee, by its terms and by its very nature, meant that Li remained responsible for the outstanding amount on the line. Putting aside the clear waiver of notice of the "extension of credit" provision of the guarantee, any other interpretation would make a guarantee of a revolving line of trade credit a useless instrument in commerce.

Under defendants' argument, any agreement by the Bank to refund the existing line following notice of withdrawal or expiration of a credit line would mean an automatic loss to the Bank of the protection of the guarantees, should the Bank be foolish enough to

agree to any refunding. Rather, to protect itself, the Bank would be required to stop extending trade credit, call in the loan and demand immediate repayment of the outstanding debt and, if required, call upon the guarantors to make good any shortfall. Aside from being cumbersome, this procedure would probably be of little help to the guarantors if the debtor does not have the wherewithal to repay the line of credit immediately.

The documentary evidence in the form of the Bank's line of credit control ledger shows that neither the level of credit nor the amount outstanding was ever increased after Li gave the required written notice in November 1991. Kuwera Aff. III Ex. 6. Indeed, while LCL remained in business, the amount outstanding was decreased by more than $475,000 from the date she terminated her guarantee, to about $170,000 by the time the line of credit was terminated in 1992 by the LCL bankruptcy.[8] The Bank did not increase LCL's outstanding debt at any point following Mrs. Li's termination of her guarantee.[9] Kuwera Aff. III, Ex. 6.

Thus, there is no legal basis to free Li from her liability under her continuing guarantee. Her highly technical argument that the "loans" specified in the complaint were new extensions of credit subsequent to Ms. Li's attempt to revoke her guarantees ignores the reality that in fact they merely rolled over existing debt. The ambiguity in the Bank's complaint has been resolved by the evidence it subsequently presented that established the debt was renewal of existing trade credit.

■ Similarly, Mrs. Li's claim that the Bank's failure to obtain her consent to extension of the line of credit beyond its expiration date of May 31, 1991 voids her guarantee

finds no support in the terms of the guarantee nor in the law. The guarantees she signed clearly state that the guarantor "waives . . . notice of . . . extensions of credit by the Bank to the Borrower." Kuwera Aff. I Ex. F. Ms. Li's outstanding liability resulting from her guarantees was in fact reduced considerably by the substantial paydown of the line of credit that occurred in early 1992, in the 90 days preceding the involuntary Chapter 7 filing by LCL's trade creditors. Kuwera Aff. III Ex. 6.

Li has raised no issue of material fact sufficient to defeat summary judgment for the Bank's enforcement of its guarantee.

#### (2)

### Jack Lee

Jack Lee is the President of Pan Pac Capital Corp., ("Pan Pac"), a corporation that, in turn, owned one-third of LCL. He owned varying shares of Pan Pac, beginning with about 30% and rising to "about" 50% (later in deposition agrees to "50, 60 percent of Pan Pac"). Pan Pac bought its one-third interest in LCL in the early 1980's. Pan Pac had also loaned money to LCL in the early 1980's. Lee Dep. in *Eastern Fish Co., Inc. v. Yoi Kin Li*, No. 15898–92 (N.Y.Sup.Ct.). Lee executed three guarantees of LCL indebtedness to the Bank, the first dated October 21, 1987, the second dated March 25, 1989 and the third dated July 26, 1990. Kuwera Aff. III, Ex. 5, Lee Dep. in *Eastern Fish*.

Jack Lee has presented three defenses to enforcement of his guarantees of LCL's indebtedness. None is consistent with the language of the guarantees nor has any basis in law. First, he asserts that the Bank's request for new guarantees of indebtedness

---

**8.** At oral argument on September 29, 1994, Ching Fun Li's former counsel, Yat Man, Esq., argued that the January 1992 renewals were not rollovers of the line of credit, but were in fact separate loans unrelated to the line of credit. Indeed, Mr. Man moved for sanctions based on his belief that the debt at issue arose not from rollovers, but from unrelated loans. However, the line of credit control ledger clearly showed that the extensions of credit in January 1992 were rollovers, not separate loans. Nevertheless, the court granted Mr. Man leave to conduct

discovery to substantiate his claim. It is worthwhile to note that after several months, Mr. Man produced no evidence in support of his claim. Ms. Li's present counsel has chosen to rest on the present record.

**9.** The only exception to the steady reduction of LCL's outstanding debt in 1992 came with the reversal of the last payment as it had been made after the date of the Chapter 7 filing. Kuwera Aff. III, Ex. 6.

relieved him of liability under preceding guarantees. Second, he asserts that "all parties understood that the guaranty extended to the particular line of credit only for which the guaranty related to and was sought by the Bank," Chisena Aff. ¶ 3, and thereby a question of material fact exists as to his intent when he signed the guarantee dated July 26, 1990. Third, Lee asserts that "no legal consideration of any kind or nature [was] given and/or received by [him] with (sic) plaintiff pertaining to the alleged July 26, 1990 'Continuing Guarantee.' " Lee Aff. ¶ 10.

■ Lee first argues that the Bank, by its *requests* for renewed guarantees established a course of conduct that irrevocably established a limit upon the guarantors' obligation *contrary* to the wording of the guarantees. This is simply untenable under basic principles of contract law. The guarantees he signed contain a provision that "[no] modification or waiver of the provisions of this guaranty [may] be effective unless in writing." The fact that the Bank requested new guarantees did not render previous guarantees ineffective in the absence of written notification to that effect. "[P]laintiff's action in requesting that defendants sign an additional guarantee [does not] warrant application of the doctrine of estoppel." *Nanuet Nat'l Bank v. Rom,* 96 A.D.2d 898, 466 N.Y.S.2d 68 (2d Dep't 1983).

■ As a second defense, Lee alleges that the guarantees "extended to the particular line of credit only." In support of this representation, again contrary to the language of the guarantees, he has presented only affirmations that such a representation was made by an official of LCL, who obviously had no authority to bind the Bank.

■ As an experienced businessman and as a substantial stakeholder in LCL (through his holdings of Pan Pac), Lee was in a particularly good position to understand the importance of the routine availability of continued credit for LCL's working capital requirements represented by the Bank's renewals of LCL's outstanding indebtedness. As the New York Court of Appeals stated in *Chemical Bank v. Sepler:* "Unless the parties to a

continuing guarantee provide otherwise in the writing, such a guarantee is not limited to the life of loans executed contemporaneously therewith, . . . and generally cannot expire by mere conduct, . . . change of circumstances, . . . or lapse of time." 60 N.Y.2d 289, 294, 469 N.Y.S.2d 609, 457 N.E.2d 714 (1983) (citations omitted).

■ In a case with far more compelling facts for the defendant than are presented here, where the debtor corporation had repaid its original, guaranteed indebtedness *prior* to the Bank's extension of the credit upon which the default occurred, the Appellate Division for the Second Department enforced the wording of the guarantee despite the plaintiff's claim of termination: "Parol evidence cannot be utilized to contradict or vary the express terms of the writing, . . . the alleged oral agreement cannot operate to terminate defendants' obligation and does not create a triable issue of fact." *Nanuet Nat'l Bank v. Rom,* 96 A.D.2d 898, 466 N.Y.S.2d 68 (1983) (citations omitted). Parol evidence of representations by Fan Wong, an officer of the debtor, who was *not* ever an agent of the Bank, is clearly insufficient to raise an issue of material fact sufficient to defeat summary judgment.

■ Lee further asserts that a question of material fact exists as to his *intent* when he signed the guarantee dated July 26, 1990. He asserts that he signed the guarantee in blank in or about early December 1990 at the request of Fan Wong, the president of LCL, because "[Wong] had to have on file, as requested by plaintiff, a blank 'Continuing Guarantee' signed by me." Lee Aff. ¶ 6. Lee asserts that Wong "stated that this document . . . had no relationship of any kind or nature to the $700,000.00 line of credit which plaintiff had extended to LCL . . . but pertained to the past lines of credit [he] had guaranteed . . ." *Id. See also* Yoi Kin Li Aff. ¶ 5, Lee Affirm. in Opp'n, Ex. F. Jack Lee is a sophisticated businessman who knew—or should have known—what he signed. Lee, not the Bank, should bear the risk he created by signing a guarantee in blank for his business associate, Fan Wong.

580

Under New York law, which controls here, relief from enforcement of a guarantee because of misrepresentations is frowned upon. Under circumstances far more sympathetic than presented by Lee's signing a blank guarantee for an associate, the Appellate Division, Second Department, in *Dunkin' Donuts of America, Inc. v. Liberatore,* 138 A.D.2d 559, 526 N.Y.S.2d 141 (1988), dismissed a wife's claim for relief from enforcement of a guarantee of her husband's business undertaking where she claimed she did not know the significance of the document, stating:

> It has been uniformly held that if the facts represented are not matters peculiarly within the representor's knowledge, and the other party has the means available to him of knowing by the exercise of ordinary intelligence the truth or real quality of the subject of the representation, he must make use of those means or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations (citations omitted).

*Id.* at 560, 526 N.Y.S.2d 141.

As was outlined above with respect to Li's defenses, the law is clear as to the continuing validity of guarantees regardless of the intent of the guarantors to cease to be obligated. Obviously the purpose of guarantees is to secure loans. Only when the loan becomes problematic do its guarantees become operative. Permitting guarantors, who are often in a far better position to perceive problems than are lending institutions, to withdraw *because* they become aware of reasons for concern, would deprive guarantees of all value.

Moreover, Lee did far less than Mrs. Li to give the Bank formal notice that he wished to end the guarantor relationship. Lee provided *no* written notice to the Bank. Mrs. Li substantially conformed with the contractual language of the guarantee with regard to terminating the guarantor relationship. She at least provided written notice that would have been effective to cut off liability for future increases in the line of credit, had any been extended.

As noted in the discussion with respect to defendant Li, contrary to both defendants' assertions, this case does not present a *new* extension of credit to LCL subsequent either to Mrs. Li's attempt to cancel her guarantee or Mr. Lee's alleged refusal to sign a new guarantee in July 1990. Both defendants' 1989 guarantees more than adequately support the Bank's recovery in this action.

Lee also appears to base a number of his assertions on the factually erroneous proposition that the line of credit was increased to $700,000 in July 1990. The Bank has, however, produced an affidavit from the loan officer and documentary evidence that the credit line had been extended to $700,000 by February of 1989, one month prior to Lee's execution of a guarantee whose validity he does not contest. Thus the language of *Corn Exchange Bank Trust Co. v. Gifford, supra,* is applicable here as it was to Mrs. Li's defense: "[The guarantee] looked into the future and anticipated new or additional transactions. Renewals of the present existing indebtedness thereafter would be included in these words." 268 N.Y. at 158, 197 N.E. 178.

Lee's third defense is his assertion of a lack of consideration for the guarantee. His position as a stakeholder in LCL, even if indirectly through his holdings in Pan Pac, makes this a particularly inapt argument.[10] However, even if Lee had a less direct economic relationship with LCL, the lack of consideration is not a valid defense to enforcement of a guarantee. In *Atlantic Bank of N.Y. v. J.D. Bertolini Indus., Ltd.,* the Appellate Division stated: "The law is clear, that 'where, as here, a guarantee is continuing, applicable to after-acquired obligations and terminable only by writing, it may not be said to have terminated due to lack of further consideration.'" 183 A.D.2d 591, 584 N.Y.S.2d 25 (1992) (quoting *Chemi-*

10. Mr. Chisena's denial (during oral argument on September 28, 1995) of Lee's stake in LCL, in view of Lee's own testimony in *Eastern Fish,* at which Lee was represented by Mr. Chisena's firm, seems, at best, to illustrate inadequate preparation by counsel, at worst, duplicity. Counsel's failure to research and respond to court as agreed following the argument is unexplained.

cal Bank v. Sepler, 60 N.Y.2d 289, 294, 469 N.Y.S.2d 609, 457 N.E.2d 714 (1983)). The Appellate Division also dismissed this defense in *Dunkin' Donuts, supra:*

> It is well established that 'where one party agrees with another party that, if such party for a consideration performs a certain act for a third person, he will guarantee payment of the consideration by such person, the act specified is impliedly requested by the guarantor to be performed and, when performed, constitutes a consideration for the guarantee'

138 A.D.2d at 561, 526 N.Y.S.2d 141 (1988) (citations omitted). Here especially, where Lee was a majority shareholder of a corporation holding a one-third interest in LCL, he has no basis for asserting a lack of consideration in guaranteeing LCL's debt.

■ Finally, Lee's own description of his purpose in signing the 1990 guarantee in blank—"pertain[ing] to past lines of credit [he] had guaranteed"—is sufficient to eliminate *any* triable issue of fact. Lee Aff. ¶ 6. Even if the 1990 guarantee were only a "continuing guarantee" for *past* lines of credit, that alone is sufficient (indeed, more than sufficient, given the continuing nature of the prior guarantees) to make him liable for LCL's deficiency.

### Conclusion

Accordingly, P.T. Bank Central Asia's motion for summary judgment against Ching Fun Li and Jack Lee and for attorney's fees and costs pursuant to the terms of the guarantees are granted. Ching Fun Li's cross-motion for summary judgment and sanctions is denied.

SO ORDERED.